USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 01/14/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ANDRII PRYIMACHENKO,                      :
                                          :     23-CV-10034 (LAK) (RWL)
                          Plaintiff,      :
                                          :
              - against -                 :     **REPORT AND RECOMMENDATION**
                                          :     **TO HON. LEWIS A. KAPLAN:**
HOME BOX OFFICE, INC., et al.,            :     **MOTION TO DISMISS**
                                          :
                          Defendants.     :
-------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

This case is about whether a 35-second clip of a historic phone call and visual

depiction of its transcription in Defendant Home Box Office, Inc.'s ("HBO") mini-series

*Chernobyl* infringes Plaintiff Andrii Pryimachenko's copyright in his video titled "The

scariest phone call of the 20th century."  Pryimachenko asserts claims for direct and

vicarious copyright infringement and violations of the Digital Millenium Copyright Act

("DMCA") under 17 U.S.C. §§ 501 and 1202.  HBO has moved to dismiss Pryimachenko's

complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6)

("Rule 12(b)(6)").  Alternatively, HBO seeks a ruling that even if Pryimachenko has a

viable claim, he cannot recover damages for any period more than three years before the

filing of the action due to the applicable three-year statute of limitations.  For the reasons

set forth below, I recommend that HBO's motion to dismiss be GRANTED, in part with

prejudice and in part without.

## BACKGROUND[1]

As required on a Rule 12(b)(6) motion to dismiss, the Court accepts the well-pled facts alleged in the complaint as true and draws all reasonable inferences in favor of Plaintiff, as the non-moving party.  *See Morrison v. National Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008).

### A.    Pryimachenko's Video

Pryimachenko is a Ukrainian artist who develops scripts and shoots and edits videos.  (AC ¶¶ 4, 9.)  In or around 2013, Pryimachenko created an audiovisual work depicting the transcript of a phone call (the "Phone Call") with the firefighter headquarters that responded to the 1986 nuclear disaster at the Chernobyl nuclear power plant (the "Video").[2]  (*Id.* ¶ 10 and Ex. 1.)  As the audio of the Phone Call plays, the Video transcribes the Phone Call in Ukrainian, with the words appearing in blinking white and red letters on a black screen resembling a computer terminal.  (*Id.* ¶ 11 and Ex. 1.)  The text has been stylized to "appear gradually with a 'burn-in' effect" to simulate "intermittent electronic interference."  (*Id.* ¶ 11.)  Pryimachenko alleges that all visual elements of the Video are his "original and creative contributions."  (*Id.*)  A screenshot from the Video as presented on YouTube is depicted below:

---

[1] The facts are drawn primarily from the Amended Complaint (Dkt. 17 ("AC")), including materials incorporated or referenced therein, such as the videos at issue and their screenshots.  *See Halebian v. Berv,* 644 F.3d 122, 130 n.7 (2d Cir. 2011) ("it is well established that on a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the court may also rely upon documents attached to the complaint as exhibits[ ] and documents incorporated by reference in the complaint") (internal quotation marks and citation omitted).

[2] The Video can be viewed at https://youtu.be/ttpzZXDNKQ8.



(*Id.* ¶ 10.)

On March 18, 2013, Pryimachenko "widely publicly displayed and disseminated" the Video, "including by" posting it to his studio's YouTube channel. (*Id.* ¶ 12.) When Pryimachenko uploaded the Video to YouTube, YouTube's terms of service explicitly stated that he submitted his content "for publication" on YouTube; that he warranted that he had the necessary rights for YouTube "to publish" the content he submitted; and that he was solely responsible for "the consequences of submitting and publishing" his content on YouTube. (Declaration of Carl Mazurek ("Mazurek Decl."), Dkt. 28, Ex. 4. at ECF 3, § 6.B.) The terms further provided that by submitting content to YouTube, the owner of the content granted **YouTube** the right to "reproduce, distribute, prepare derivative works of, display, and perform the Content." (*Id.* at ECF 3, § 6.C.) The terms also provided that the content owner gave each **YouTube user** the right to "use, reproduce, distribute,

display and perform such Content as permitted through the functionality of the Service and under these Terms of Service" (*id.*), although not for any other purpose (*id.* § 5.B).

In or about 2016, Pryimachenko offered the Video for sale or license to PJSC Telaradiocompany Lux ("PJSC"), based in Lviv, Ukraine. (AC ¶ 13.) Following that 2016 publication, Pryimachenko registered the Video with the Ukrainian Copyright Office. (*Id.* ¶ 14.) Pryimachenko did not register the Video with the United States Copyright Office. (*Id.* ¶¶ 13, 14.) At the time the instant action was filed, the Video had 8.7 million views. (*Id.* ¶ 12.)

**B.    HBO's Video**

In or around 2019, HBO released the television mini-series *Chernobyl*, which received "myriad awards and recognition" and was viewed by "over 50% of all HBO subscribers amassing more than 8 million viewers" the first year it was released. (*Id.* ¶ 16.) Both the first episode of the mini-series and a promotional video for it include the audio of the Phone Call and depict a real-time transcription of the Phone Call in a computer-terminal style, with blinking white and red letters ("HBO's Video"). (Mazurek Decl. Ex. 1.)

**C.    Pryimachenko's Copyright Infringement Claim**

Pryimachenko asserts claims for direct and vicarious copyright infringement, and for violation of the DMCA. He claims that following his publication of the Video in 2016, HBO used the Video without his authorization for commercial purposes including, copying, reproducing, publicly displaying, distributing, or creating derivative works of the

Video in HBO's *Chernobyl* mini-series.[3]  Pryimachenko alleges that HBO's Video incorporates the same elements as his Video, including the same "composition, colors, arrangement, lighting, angle, sound, and overall appearance."  (AC ¶¶ 17, 20.)  As a tell-tale sign of copying, Pryimachenko points to a translation error in the transcription appearing in both his Video and HBO's Video.  (*Id.* ¶ 18.)  With respect to the DMCA, Pryimachenko contends that HBO distributed and published the Video under HBO's own name after removing Pryimachenko's attribution information.  (*Id.* ¶ 38.)  Pryimachenko seeks an order enjoining HBO from infringing his copyright, and awarding him all profits gained by HBO from infringement, statutory damages, interest, attorney's fees and costs under 17 U.S.C. §§ 505 and 1203.  (*Id.* at 9-10.)

## PROCEDURAL HISTORY

Pryimachenko filed his initial complaint on November 14, 2023.  (Dkt. 1.)  He filed the operative Amended Complaint on January 8, 2024.  (Dkt. 17.)  On March 6, 2024, HBO moved for dismissal.  (Dkt. 26.)  On April 5, 2024, Pryimachenko filed his opposition.  (Dkt. 31.)  HBO replied on April 19, 2024, at which time the motion was fully briefed.[4]  (Dkt. 32.)  The motion has been referred to me for a Report and Recommendation.  (Dkt. 8.)

---

[3] The Copyright Act defines a derivative work as "a work based upon one or more preexisting works" and includes a "work consisting of ... modifications which, as a whole, represent an original work of authorship."  17 U.S.C. § 101.

[4] The Court uses the following conventions to refer to the parties' briefs.  "Def. Mem." refers to the Memorandum In Support Of HBO's Motion to Dismiss Plaintiff's Amended Complaint.  (Dkt. 27.)  "Pl. Opp." refers to Plaintiff's Opposition to Defendants' Motion to Dismiss.  (Dkt. 31.)  "Def. Reply" refers to the Reply Memorandum in Support of HBO's Motion to Dismiss Plaintiff's Amended Complaint.  (Dkt. 32.)

**LEGAL STANDARDS ON MOTION TO DISMISS**

Under Rule 12(b)(6), a pleading may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007).  A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1940 (2009).

"Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id*. (quoting *Twombly*, 550 U.S. at 557).  In considering a motion to dismiss, a district court "accept[s] all factual claims in the complaint as true, and draw[s] all reasonable inferences in the plaintiff's favor."  *Lotes Co. v. Hon Hai Precision Industry Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (internal quotation marks and citation omitted).  However, this tenet is "inapplicable to legal conclusions.   Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.   "[R]ather, the complaint's factual allegations must be enough to raise a right to relief above the speculative level … *i.e.*, enough to make the claim plausible."  *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal quotation marks, citation, and brackets omitted).   A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558.

For the purpose of considering a motion to dismiss pursuant to Rule 12(b)(6), a court generally is confined to the facts alleged in the complaint. *See Cortec Industries v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991). A court may, however, consider additional materials, including documents attached to the complaint, documents incorporated into the complaint by reference, public records, and documents that the plaintiff either possessed or knew about, and relied upon, in bringing the suit. *See Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013). In that regard, if "a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." *Poindexter v. EMI Record Group Inc.*, No. 11-CV-559, 2012 WL 1027639, at *2 (S.D.N.Y. March 27, 2012).

## JUDICIAL NOTICE OF YOUTUBE TERMS OF SERVICE

As discussed below, YouTube's terms of service play an important role in the case. The terms of service, submitted as an exhibit by HBO, are those in effect as of June 9, 2010, and captured as of April 7, 2013. (Mazurek Decl. Ex. 4.) HBO located the YouTube terms of service and other YouTube pages using the Wayback Machine – a "digital archive that allows users to view websites as they appeared at various points in time in the past." (*Id.* ¶ 3 n.1.) Courts may take judicial notice of contents of webpages accessed through the Wayback Machine. *See Golden v. NBCUniversal Media, LLC*, 688 F. Supp.3d 150, 165 n.14 (S.D.N.Y. 2023) (taking judicial notice of webpage archives on Wayback Machine where plaintiff did not remark on reliance of source). Courts also may take judicial notice of webpages explaining the service's features or terms and conditions when their authenticity is not in dispute. *See Lowell v. Lyft, Inc.*, 352 F. Supp.3d 248, 263

n.5 (S.D.N.Y. 2018) (taking judicial notice of webpage explaining features of ride-sharing service). Pryimachenko has not challenged the authenticity of the YouTube pages obtained from the Wayback Machine. Accordingly, the Court may take judicial notice of those items. Whether the Court may consider them on the instant motion is a different question, but one also answered in the affirmative.

Pryimachenko does not mention YouTube's terms of service in the Amended Complaint. As noted above, a court generally does not look beyond "facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (internal quotation marks, citation, and elisions omitted). "[I]n some cases," however, "a document not expressly incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss." *Id.* (citation omitted). By alleging facts disclosing he posted the Video to YouTube, (*see* AC ¶ 12), and bearing the burden to prove the place of first publication as discussed below, Pryimachenko has made the YouTube terms of service integral to the Amended Complaint. The Court therefore takes judicial notice of and considers YouTube's terms of service as they appeared on April 7, 2013. *See Business Casual Holdings, LLC v. YouTube, LLC*, No. 21-CV-3610, 2022 WL 837596, at *1 n.1 (S.D.N.Y. March 21, 2022) (taking judicial notice of terms of service not reproduced in or attached to the complaint); *Patel v. University of Vermont & State Agricultural College*, 526 F. Supp.3d 3, 19 (D. Vt. 2021) (taking judicial notice of terms of service not mentioned in complaint). For the same reasons, the Court takes judicial notice of the two additional YouTube web pages concerning YouTube's services submitted by

HBO, one denoted "YouTube Essentials" and the other "Using YouTube Red benefits." (Mazurek Decl. Exs. 2, 3.)

## DISCUSSION

HBO seeks dismissal of both Pryimachenko's copyright infringement and DCMA claims. HBO raises four points. First, HBO argues that Pryimachenko's infringement claims should be dismissed because, by his own allegations, Pryimachenko simultaneously published the Video in Ukraine and the United States in 2013 but did not register the Video with the U.S. Copyright Office as required under the Copyright Act. Alternatively, HBO asserts that the infringement claims should be dismissed because Pryimachenko does not allege facts sufficient to establish when or how the Video was first published. Second, HBO also argues for dismissal of the infringement claims because the Amended Complaint fails to allege that HBO copied protectable elements of the Video. Third, HBO asserts that Pryimachenko fails to state a DMCA claim because attribution of its own copyright management information ("CMI") to HBO's Video as a whole is not a violation, and because the Amended Complaint does not plausibly plead that HBO removed any of Pryimachenko's CMI. Finally, in the event any claims survive dismissal, HBO argues that Pryimachenko's damages for any infringement are limited to the three-year period preceding commencement of the action because Pryimachenko learned about the alleged infringement no later than 2019.

As discussed below, the Court finds that Pryimachenko's infringement claims should be dismissed, without prejudice, because Pryimachenko has not adequately alleged the place of first publication of the Video and exemption from the United States

registration requirement.  The Court also finds that Pryimachenko has not adequately pled claims for violation of the DMCA, both of which should be dismissed with prejudice.

## I.    The Infringement Claims

### A.    Pryimachenko Has Not Sufficiently Pled The Video Is A Foreign Work

The Copyright Act (the "Act") prohibits a "civil action for infringement of the copyright in any United States work" from being brought "until preregistration or registration of the copyright claim has been made in accordance with [the Act]."  17 U.S.C. § 411(a).  "[N]on-United States works – generally, works first published outside the United States in a foreign country that is a signatory to the Berne Convention[5] – are exempt from registration."  *DigitAlb, Sh.a v. Setplex, LLC*, 284 F. Supp.3d 547, 555 (S.D.N.Y. 2018); *see also Football Association Premier League Ltd. v. YouTube, Inc.*, 633 F. Supp.2d 159, 162 (S.D.N.Y. 2009) (§ 411(a), which "requires ... registration before any copyright infringement suit may be brought, is limited to U.S. works").  A "United States work" is one that is first published in the United States or, inter alia, "simultaneously in the United States and another treaty party or parties, whose law grants a term of copyright protection that is the same as or longer than the term provided in the United States."  17 U.S.C. § 101.  Where, as here, a work is not registered in the United States, a plaintiff suing for

---

[5] "The Berne Convention for the Protection of Literary and Artistic Works [], which took effect in 1886, is the principal accord governing international copyright relations." "Berne's 164 member states … [agree to provide] the minimum level of [copyright] protection," and to "treat authors from other member countries as well as they treat their own."  *Golan v. Holder*, 565 U.S. 302, 306-07, 308, 132 S. Ct. 873, 877, 878 (2012).  The United States joined the convention on March 1, 1989, and Ukraine became a signatory on October 25, 1995.  *See* WIPOLEX, *WIPO-Administered Treaties*, https://www.wipo.int/wipolex/en/treaties/ShowResults?search_what=B&bo_id=7  (last visited January 14, 2025).

infringement bears the burden of establishing that the work is not a United States work and thus exempt from the registration requirement. *DigitAlb*, 284 F. Supp.3d at 555.

The Amended Complaint asserts that Pryimachenko first published the Video in Ukraine in 2016, when "it was first publicly offered for sale … to the company PJSC Telaradiocompany Lux, which is based in Lviv, Ukraine." (AC ¶ 13.) Standing alone, that allegation might be sufficient to plausibly plead that the Video is a non-United States work exempt from the Copyright Act's registration requirement. But the allegation does not stand alone. The Amended Complaint alleges that in 2013 Pryimachenko "widely publicly displayed and disseminated the [Video] including by posting [it] to his studio's YouTube channel" in March of 2013. (*Id*. ¶ 12.) Those allegations, HBO argues, establish the Video as a non-foreign work, because posting the Video to YouTube "made it available to the entire world at once," constituting simultaneous publication in the United States and Ukraine. (Def. Mem. at 8.)

The Court finds that the Amended Complaint does not sufficiently plead facts demonstrating that the Video was first published in the Ukraine. Pryimachenko's allegations of his wide, public dissemination of the Video in 2013 conflict with his allegation of first publication in Ukraine in 2016. That is so for two reasons. First, the Amended Complaint's use of the terms "disseminated" and "including" is opaque, potentially masking facts that establish first publication of the Video in 2013. Second, Pryimachenko's posting of the Video to YouTube in 2013 alone may constitute publication.

1.    "Publication" As Defined By The Copyright Act

Determining the place of first publication turns on the Copyright Act's definition of "publication."  The Act defines "publication" as "the distribution of copies … of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending."  17 U.S.C. § 101.  "A public performance or display of a work does not of itself constitute publication."  *Id*.  But "offering to distribute copies … to a group of persons for purposes of further distribution, public performance, or public display" does "constitute[ ] publication."[6]  *Id*.  As one commentator has observed, however, the Copyright Act was "drafted in the hard copy era"; determining exactly what publication means in the Internet era is not necessarily straight forward.  *Publication under the 1976 Act – Online and Internet simultaneous publication*, 3 Patry on Copyright § 6:55.40.

The U.S. Copyright Office has addressed the issue of "what publication means in the Internet era."  It "considers a work 'published' when it is made available online if the copyright owner authorizes the end user to retain copies …. For example, the fact that a work is expressly authorized for reproduction or download by members of the public or is expressly authorized for distribution by the public creates a reasonable inference that copies … have been distributed and that publication has occurred" – it is not enough for

---

[6] Under the Copyright Act, to "perform or display a work 'publicly' means – (1)  to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or (2)  to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times."  17 U.S.C. § 101.

the work to be "merely displayed or performed online."[7]    U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 1008.3(B) (3d ed. 2021) (the "Compendium").  While "[i]t may seem odd that allowing the whole world to view or hear a work does not constitute publication of a work[,] … [a] mere display or performance is not a distribution, because the end user does not retain a 'copy' … of the work, as defined under the Copyright Act."  *Id.* § 1008.3(B) (citing 17 U.S.C. § 101 (definition of "copies")).

### 2.    "Widely … Disseminated … Including"

It is Pryimachenko's burden to establish the place of first publication and to therefore plead facts plausibly demonstrating that the Video was first published in Ukraine.  But the Amended Complaint employs vague words that obfuscate the facts necessary for the Court to determine when and where Pryimachenko first published the

---

[7] Courts, including within this Circuit, have sought guidance from the Compendium, which "provides instruction to agency staff regarding their statutory duties and provides expert guidance to copyright applicants, practitioners, scholars, the courts, and members of the general public regarding institutional practices and related principles of law." Compendium § Introduction; *see, e.g.*, *Beverly Hills Teddy Bear Co. v. Best Brands Consumer Products, Inc.*, No. 19-CV-3766, 2024 WL 1346562, at *2 (S.D.N.Y. March 29, 2024) (using Compendium as guidance in deciding copyright case); *Lieb v. Korangy Publishing, Inc.*, No. 15-CV-40, 2022 WL 1124850, at *9-11 (E.D.N.Y. Apr. 14, 2022) (same), *appeal dismissed*, 2023 WL 3439481 (2d Cir. March 2, 2023).

While the instant motion was pending, the Supreme Court overruled *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778 (1984), and held that courts may not defer to an agency's interpretation of an ambiguous statutory provision, and instead must make their own determinations concerning the provision's meaning.  *Loper Bright Enterprises v. Raimondo*, --- U.S. ---, 144 S. Ct. 2244, 2270-73 (2024).  Courts may, however, still give weight to "interpretations and opinions" of an agency, like guides or manuals, "made in pursuance of official duty" and "based upon ... specialized experience," so long as the Court exercises its independent judgment. *Id.* at 2259 (discussing *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40, 65 S.Ct. 161, 164 (1944)).  Here, the Court does not defer to the Compendium's explanation of "publication," although it does give the Compendium some weight, considering the specialized experience the Copyright Office has in dealing with publication in the Internet age.  In any event, the Court's analysis is grounded in the Copyright Act, not the Compendium.

Video.  What does Pryimachenko mean by having "disseminated" the Video?  It cannot mean "displayed" – which the Act makes clear is not publication – because Pryimachenko alleges that he both "widely publicly displayed ***and*** disseminated" the Video in 2013.  (AC ¶ 12 (emphasis added).)  Is "disseminated" just another way of saying "distributed," which the Act equates with publication?  The ambiguity is compounded by the term "including"; i.e, that Pryimachenko widely disseminated the Video in 2013 "***including*** by posting [it] to … YouTube." (*Id.* (emphasis added).)  The word "including" implies that the Video was disseminated in multiple ways of which posting to YouTube was only one.  *See In re Refco Inc., Securities Litigation*, Nos. 08-CV-3086, 08-CV-3065, 2009 WL 10666107 (S.D.N.Y. Nov. 20, 2009) ("'including' means 'a partial list' that 'indicates that something is not included'") (citing *Including*, Black's Law Dictionary 766, 1044 (1999)), *R. & R. adopted*, 2010 WL 11500548 (S.D.N.Y. Jan. 21, 2010).  Pryimachenko, however, has not described what those additional forms of dissemination were.

The lack of transparency is not a trivial matter.  To the contrary, it is material to the determination of whether Pryimachenko has sufficiently pled a place of first publication that does not include the United States.  For instance, in 2013 did Pryimachenko disseminate the Video by posting it to social media platforms in addition to YouTube? *See Brunson v. Cook*, No. 20-CV-1056, 2023 WL 2668498, at *13 (M.D. Tenn. March 28, 2023) (posting video on YouTube, Instagram, and Twitter was simultaneous publication).  Did Pryimachenko disseminate the Video by sending copies to others?  *See Grecco v. Age Fotostock America, Inc.*, No. 21-CV-423, 2021 WL 4555599, at *4 (S.D.N.Y. Oct. 5, 2021) (equating distribution with "dissemination of a 'copy'").  If so, were any of those

persons in the United States?   More generally, by what means, to whom, and when did Pryimachenko provide the Video other than by posting it to YouTube?

The Amended Complaint makes vague allegations that, whether intended to or not, prevent the Court from determining whether the Video is exempt from U.S. registration.   While Pryimachenko has alleged he first published the Video in 2016 and specifically identifies to whom, the allegation of "first" publication remains conclusory and at odds with the allegation that he "widely and publicly … disseminated" the Video "including by" posting it to YouTube three years earlier in 2013.   Under these circumstances, dismissal is required.   *See DigitAlb,* 284 F. Supp.3d at 556 (dismissing copyright infringement claim where plaintiff had not alleged enough facts to show place of first publication); *UAB "Planner 5D" v. Facebook, Inc.*, No. 19-CV-3132, 2019 WL 6219223, at *6 (N.D. Cal. Nov. 21, 2019) (same).[8]

### 3.    YouTube

Even if Pryimachenko disseminated the Video in 2013 only by posting it to YouTube, HBO argues that doing so was publication.  That ultimately may prove true, but the Court cannot come to that conclusion based on the limited record before it.

---

[8] Pryimachenko argues *DitigAlb* and *UAB* do not support dismissal because the plaintiffs in those cases "failed to make any allegation that the works at issue were not U.S. Works," whereas Pryimachenko alleges with specificity that the Video was first published in Ukraine. (Pl. Opp. at 4-5.)  Not so.  In *DitigAlb*, the plaintiff alleged that the work was published outside of the United States.  He did so in conclusory fashion, however, and the lack of specificity required dismissal.  *See DitigAlb*, 284 F. Supp.3d at 555-56.  In *UAB*, plaintiff alleged in conclusory fashion that all the works were authored in Europe or Russia, and that they were "unpublished," which, without more, could not survive dismissal.  *See* 2019 WL 6219223, at *6.  In any event, Pryimachenko's Amended Complaint is problematic due to affirmative allegations that, depending on what information they mask, contradict the allegation of first publication in 2016.  As such, Pryimachenko has not plausibly pled first publication of the Video in 2016.

Merely posting a video to an Internet site is not publication. *See, e.g.*, *Feingold v. RageOn, Inc.*, 472 F. Supp.3d 94, 99-100 (S.D.N.Y. 2020) (explaining that providing a photograph for posting to a fanblog was not publication); *Einhorn v. Megatroyd Productions*, 426 F. Supp.2d 189, 196-97 (S.D.N.Y. 2006) (finding that posting video of show's performance on defendant's website did not constitute publication); *teamLab Inc. v. Museum of Dream Space, LLC*, 650 F. Supp.3d 934, 946-47 (C.D. Cal. 2023) (holding that posting digital art exhibits to plaintiff's website was not publication, even though users potentially could copy the images without authorization). That makes sense since the Copyright Act expressly provides that mere display of a work is not publication. 17 U.S.C. § 101. Courts so holding also have construed publication as requiring some form of "'commercial exploitation,' which is noticeably lacking when a digital file is merely posted online." *teamLab*, 650 F. Supp.3d at 947 (citing Feingold, 472 F. Supp.3d at 99-100; *Rogers v. Better Business Bureau of Metropolitan Houston, Inc.*, 887 F. Supp.2d 722, 730-31 (S.D. Tex. 2012)).

Here, however, Pryimachenko did not merely post the Video to the Internet. Rather, Pryimachenko posted the Video to YouTube, a social media site that is subject to terms of service allowing for certain sharing and commercial exploitation of the content posted by users. Only a few courts appear to have addressed the issue of whether posting works on social media platforms like YouTube qualifies as publication under the Copyright Act. *See Whyte Monkee Productions, LLC v. Netflix, Inc.*, 97 F.4th 699, 718-19 (10th Cir. 2024), *reh'g granted and judgment vacated*, 101 F.4th 787 (10th Cir. 2024); *Brunson v. Cook*, 2023 WL 2668498, at *13; *cf. Philpot v. WOS, Inc.*, No. 18-CV-339, 2019 WL 1767208, at *12 (W.D. Tex. Apr. 22, 2019) (finding that posting photos to Flickr,

a website displaying photographs, does not qualify as publication under the Copyright Act because such display is "neither a sale or transfer of ownership nor a distribution to others for further publication").

In *Whyte*, one of the issues before the district court was whether use of a video in a Netflix documentary series without the copyright holder's permission qualified as a fair use under the Copyright Act. *Whyte Monkee Prods., LLC v. Netflix, Inc.*, 601 F. Supp.3d 1117, 1137 (W.D. Okla. 2022), *aff'd in part, rev'd in part and remanded*, 97 F.4th 699 (10th Cir. 2024). Examining the nature of the work (one of the fair-use defense factors), the *Whyte* district court determined that the video was previously published because it had been "livestreamed via YouTube and remained there afterwards." *Id.* On appeal, plaintiff argued that the district court had erred in holding that the video had been previously published because it had not been published "in a copyright sense" since publication could only occur where (1) the owner "distributed tangible copies of the work to the public," or (2) the work was "exhibited or displayed in such a manner as to permit unrestricted copying by the general public." *Whyte*, 97 F.4th at 717 (internal quotation marks and citations omitted).

The Tenth Circuit affirmed the district court's analysis of the publication issue, holding that posting the video on YouTube "appears to satisfy even the stringent interpretation of 'publication' that [plaintiffs] posit." *Id.* at 718. Referencing guidance from the Compendium, the Tenth Circuit explained that because the author of the work livestreamed the video, and then made it publicly available on YouTube, the "work was 'exhibited or displayed in such a manner as to permit unrestricted copying by the general public,' as members of the public could access and download the video at any time,"

17

thereby satisfying the Copyright Act's publication requirements.[9]  *Id.* (quoting *Estate of Martin Luther King, Jr., Inc. v. CBS, Inc.*, 194 F.3d 1211, 1215 (11th Cir. 1999)); *see also International Medical Devices v. Cornell*, No. 20-CV-3503, 2022 WL 17080130, at *9 (C.D. Cal. Sept. 26, 2022) (stating on summary adjudication that it was "undisputed that the video was first published on YouTube in October 2014").

In *Brunson*, the issue before the court was whether a song was published under the Copyright Act when it was uploaded to YouTube, Instagram, and Twitter.  2023 WL 2668498, at *14.  The *Brunson* court, relying in part on the platforms' sharing capabilities, held that the work was published "when it was made available on YouTube, Instagram, and Twitter, where it could be viewed and shared by the public."  *Id.* at *13.  The *Brunson* court explained that while simply uploading a work to a social media platform might not constitute publication, when a creator uploads the work to a platform like YouTube, Instagram or Twitter, the creator "loses the ability to control either duplication or further distribution of his or her work."  *Id.* at *11 (quoting *Getaped.Com, Inc. v. Cangemi*, 188 F. Supp.2d 398, 402 (S.D.N.Y. 2002)).

The court rejected the notion that a work needs to be "downloadable" (such as in *Whyte*) for it to be published under the Copyright Act, noting such a requirement is "not wholly supported by the Compendium."  *Id.* at *12, 14.  The *Brunson* court further held, in the alternative, that "[e]ven if making a work available on YouTube, Instagram, and Twitter does not constitute 'distribution' because the end user cannot retain a downloadable

---

[9] On May 13, 2024, the Tenth Circuit vacated the March 27, 2024, judgment and granted Appellee's motion for panel rehearing on issues not relevant here.  *See Whyte Monkee*, 101 F.4th at 787 (identifying issues specific to fair-use analysis, particularly concerning when use of a work is "commercial").

copy, … publication nonetheless occurs when a work is made available to YouTube, Instagram, and Twitter due to the terms of use or services to which a creator on these platforms must agree in order to post the work to the respective platforms."  *Id.* at *13. The Court referenced in particular terms of service, like those here, that granted YouTube the right to "reproduce, distribute, prepare derivative works, display and perform" the content it has been provided.  *Id*.

The Court, like the *Brunson* court, finds consideration of YouTube's terms of service appropriate.   Two key provisions in YouTube's 2013 terms of service are particularly relevant.  First, pursuant to the terms of service, Pryimachenko expressly granted YouTube "a worldwide, non-exclusive, royalty-free, sublicenseable and transferable license to use, reproduce, distribute, prepare derivative works of, display, and perform the Content."  (Mazurek Decl. Ex. 4 at ECF 3, § 6.C.)  HBO suggests that provision alone constitutes publication because it allows YouTube to make and distribute copies and derivative works, not merely display and perform the Video.  The Copyright Act, however, does not equate publication with distribution to a **single** person for purposes of further distribution or copying.  Rather, "offering to distribute copies … to **a group** of persons for purposes of further distribution, public performance, or public display" constitutes publication.  17 U.S.C. § 101 (emphasis added).  In *Brunson*, the "group" requirement was met because the work was posted to three separate social media platforms – YouTube, Instagram, and Twitter.  *Brunson*, 2023 WL 2668498, at *12-

13.    To the extent Pryimachenko posted the Video only to YouTube, the "group" requirement would be absent.[10]

Of greater import, the terms of service provide that the content provider (in this instance, Pryimachenko) not only authorizes YouTube to distribute the Video, but also further authorizes **YouTube's users** to copy, distribute, prepare derivative copies of, perform, and display the work.[11]   HBO argues that the further grant of rights to YouTube's users satisfies the requirements for publication under the Copyright Act.  (Def. Mem. at 6-7.)  To the extent such an unqualified grant of rights is given, the Court agrees.

But the terms of service are not unqualified.   Under the terms of service, Pryimachenko granted each YouTube user a non-exclusive license "to use, reproduce, distribute, display and perform such Content as permitted **through the functionality** of the Service."  (Mazurek Decl. Ex. 4 at ECF 3, § 6.C (emphasis added).)  HBO maintains that at the relevant time YouTube included features and functionality enabling users to

---

[10] HBO argues that a single entity, comprised of multiple persons, like YouTube, should be treated as a "group of persons" under the Copyright Act.  (Def. Reply at 4 n.3 (citing *Bagdadi v. Nazar*, 84 F.3d 1194, 1198-99 (9th Cir. 1996) (finding a public school comprised of multiple teachers and students constitutes a "group of persons" under the Copyright Act)).)  The Court is not aware of any case so holding with respect to a single social media platform like YouTube.  To the contrary, the Compendium suggests otherwise, offering as an example of publication when "a sound recording has been offered for distribution to **multiple** online streaming or download services."  *See* Compendium § 1008.3(B) (emphasis added).  Moreover, *Bagdadi* is distinguishable.  The "entity" at issue was a public school comprised of both employees and students, whereas YouTube is a single corporate entity, the business of which is to distribute content to others.  While YouTube may offer its services to members of the public who wish to engage with its platform, YouTube itself is not composed of members of the public in the same way a school is made up of administrators, teachers, and students.  *See generally Brunson*, 2023 WL 2668498, at *9 (noting that "courts have written very little on what it means under the Copyright Act for a work to be distributed to a 'group of persons'").

[11] As stated in the terms of service, the rights provided to YouTube are sublicensable.  (Mazurek Decl. Ex. 4 at ECF 3, § 6.C.)

download and share the Video, thus authorizing third-party users to reproduce and distribute copies.  (Def. Mem. at 7-8 & nn.4-5.)  The terms of service that are before the Court and which the Court may consider are not so definitive.

With respect to download functionality, HBO points to YouTube's Premium "Red" service from years ago, which enabled users to download videos.  Pryimachenko asserts that the "download button did not exist in 2013, when Pryimachenko uploaded the [Video]."  (Pl. Opp. at 4.)  YouTube's terms of service in 2013 do reference and suggest the existence of a download feature but do not indicate whether it was in fact available at the time.  (*See* Mazurek Decl. Ex. 4 at ECF 3, § 5.B (stating that users "shall not download any Content unless [they] see a 'download' or similar link displayed").)  And, as HBO acknowledges, the particular YouTube page before the Court that explains use of YouTube Red benefits and the ability to save videos offline is dated December 8, 2015, thus indicating that the feature was available since "at least [December] 2015."  (Def. Mem. at 7 n.5.)  Based on the facts, as alleged in the Amended Complaint, and drawing all reasonable inferences in Pryimachenko's favor, the Court cannot conclude for purposes of the instant motion that the download function was in fact available on YouTube's platform at the time Pryimachenko posted the Video in 2013.[12]

The "share function," however, merits a different conclusion.  The Amended Complaint includes a screenshot of the Video, which clearly features a "share" function.  (AC ¶ 10.)  HBO argues that the existence of the "share" button, "which allows users to

---

[12] The Court does not exclude the possibility that, if a download function was introduced on YouTube after Pryimachenko posted the Video to YouTube in 2013 but before Pryimachenko sold the Video in 2016, publication would have occurred in that time frame inasmuch as Pryimachenko did not remove the Video from YouTube.  That argument, however, has not been developed by the parties and cannot be a resolved on the present record.

distribute the Video via social networks and email," is further evidence of distribution. (*See* Def. Mem. at 7.)  *See Brunson*, 2023 WL 2668498, at *11-12 (noting plaintiff took steps to make their work available on "YouTube, where the work could then be shared by a theoretically infinite number of individuals to a variety of different web-based platforms"). The Amended Complaint is silent as to when the screenshot was taken, begging the question whether the share function was available in 2013 when Pryimachenko posted the Video to YouTube.  The answer to that question is readily determined.  A screenshot of a webpage titled "YouTube Essentials," dated March 11, 2013, contains the heading "Share," under which users are informed that that they can "[s]hare a YouTube video with your friends via email, social networks, or blog directly from the video page" by "[j]ust click[ing] the Share button underneath the video."  (Mazurek Decl. Ex. 2 at ECF 4.)  As explained above, the YouTube pages submitted by HBO may be considered on the instant motion.  Accordingly, the Court takes judicial notice that YouTube users could share the Video on YouTube in 2013.

But the existence of the share function in 2013 does not allow the Court to find posting to YouTube alone constituted publication.  The Amended Complaint, and the YouTube terms of service and the descriptions of services that are before the Court, are silent on what is means for a user to "share" content on YouTube.  For example, did sharing enable a user to send a link to another user allowing them to view the content on YouTube?[13]  Did it go further and embed a copy of the Video that is shared with others? Or did sharing function in some other way?  These particulars matter in determining

---

[13] Pryimachenko asserts that the share button on YouTube merely "allows users to direct others to view the original copy that Pryimachenko posted."  (Pl. Opp. at 9.)  However, he cites no support for that statement.

whether YouTube's "functionality" at the time permitted users to further copy, distribute, or publicly display the Video.  Again, drawing all reasonable inferences in Pryimachenko's favor, the Court cannot conclude at this stage in the litigation that YouTube's share function permitted users to distribute, copy, or publicly display the Video so as to make posting of the Video to YouTube publication as defined by the Act.

One section of the YouTube terms of service expressly references publication.  (*Id.* at ECF 3, § 6.B.)  Pryimachenko thus licensed rights to the Video to YouTube "for publication" on its service.  He warranted that he had the right to permit YouTube to "publish" the Video and acknowledged that he had sole responsibility for "the consequences of submitting and publishing" the Video.  (*Id.*)  While notable and relevant, those provisions are not dispositive; use of the terms "publish," "publishing," and "publication" in YouTube's terms of service does not necessarily equate with use of the term "publication" in the Copyright Act.  *See* Compendium § 1008.3(A) ("Although, in the vernacular, the term 'published' has acquired broad meaning, it has a much narrower meaning as a term of art within the Copyright Act").

The Amended Complaint concedes that Pryimachenko "widely publicly … disseminated" the Video via You Tube in 2013.  By doing so, Pryimachenko agreed to YouTube's terms of service.  Whether that constituted publication depends on what YouTube's "functionality" was at the relevant time, a fact issue that is neither addressed by the Amended Complaint nor resolved by the terms of service or descriptions of YouTube services that are before the Court.

### 4.    "Simultaneous"

Even if Pryimachenko did publish the Video in 2013, the next question would be whether he did so in the United States.  HBO argues that when Pryimachenko posted the

Video to YouTube, it was simultaneously published globally, including both in Ukraine and the United States.  (Def. Mem. at 8.)  Pryiamachenko argues that even if posting the Video to YouTube was a publication, that publication was initiated in Ukraine and was not simultaneous with publication in the United States.[14]  (Pl. Opp. at 11-12.)  But without being able to fully determine at this juncture what Pryimachenko did when he "widely … disseminated" the Video "including by" posting it to YouTube, the Court cannot address whether doing so constituted publication – simultaneous or otherwise.

In sum, by virtue of its vague and contradictory allegations, the Amended Complaint does not sufficiently plead that the Video was first published outside the United States and is exempt from the United States registration requirements.  Dismissal therefore is warranted.

## B.    Copying

Having determined that Pryimachenko's infringement claims should be dismissed based on failure to sufficiently plead the place of first publication, the Court does not address the issue of whether the Amended Complaint adequately alleges copying.

---

[14] Pryimachenko, citing to *Noris v. Goldner*, also asserts that the Video is a foreign work because he is not and was not a U.S. resident when the Video was posted.  (Pl. Opp. at 3 (citing No. 19-CV-5491, 2023 WL 5016472, at *4 (S.D.N.Y. May 22, 2023), *R. & R. adopted in relevant part*, 2023 WL 5477229 (S.D.N.Y. Aug. 24, 2023)).)  That is not correct.  While Pryimachenko's place of residence may be relevant in certain circumstances, the material issue is whether **the work** was first published outside of the United States.  *See id.*  Pryimachenko also asserts that HBO has the burden to prove publication was simultaneous.  (Pl. Opp. at 11.)  That too is incorrect.  *See DigitAlb,* 284 F. Supp.3d at 554-55 (stating that plaintiff bears the burden establishing that the work is not a United States work as defined by the Act and thereby exempt from the registration requirement).

## II.    The DMCA Claims

Pryimachenko also alleges violations of sections 1202(a) and (b) of the DMCA.[15] (AC ¶¶ 35-43.)  Both claims should be dismissed.

### A.    False CMI

Section 1202(a) prohibits providing or distributing false CMI.  17 U.S.C. § 1202(a). Under the DMCA, "CMI" is defined as information "conveyed in connection with copies or … of a work or performances or displays of a work, including in digital form," including, inter alia, "[t]he name of, and other identifying information about, the copyright owner of the work."  17 U.S.C. § 1202(c)(3).  To assert a claim under § 1202(a), a plaintiff "must plausibly allege that defendant knowingly provided false copyright information and that the defendant did so with the intent to induce, enable, facilitate, or conceal an infringement."  *Krechmer v. Tantaros*, 747 F. App'x 6, 9 (2d Cir. 2018); *see also Crowley v. Jones*, 608 F. Supp.3d 78, 90 (S.D.N.Y. 2022) ("a plaintiff must allege that the defendant both knew that the CMI was false, and provided or distributed the false CMI with the intent to induce, enable, facilitate, or conceal infringement") (internal quotation marks and citation omitted).

A viable claim for false CMI, however, does not exist where a defendant incorporates copyrighted materials into its own distinct work and then applies its name as the author of the work.  *See, e.g.*, *Michael Greco Productions, Inc. v. Time USA, LLC*, No. 20-CV-4875, 2021 WL 3192543, at *5 (S.D.N.Y. July 27, 2021) (rejecting § 1202(a) claim

---

[15] The Amended Complaint's insufficient pleading of the place of first publication is not an impediment to consideration of the DMCA claims.  *See Playboy Enterprises International Inc. v. Mediatakeout.com LLC*, No. 15-CV-7053, 2016 WL 1023321, at *5 (S.D.N.Y. March 8, 2016) (stating that the plaintiff's "failure to register its copyrighted work is not a bar to a DMCA action") (internal quotation marks and citation omitted).

because the defendant incorporated the photograph at issue into a larger distinct work, namely a magazine cover); *Park v. Skidmore, Owings & Merrill LLP*, No. 17-CV-4473, 2019 WL 9228987, at *11 (S.D.N.Y. Sept. 30, 2019) (dismissing § 1202(a) claim because plaintiff's copyrighted work appeared in an unquestionably distinct work from plaintiffs even where plaintiff alleged copyright infringement); *see also Crowley*, 608 F. Supp.3d at 90 (dismissing § 1202(a) claim because defendant "cannot violate the DMCA by associating its name with a derivative work that is unquestionably a distinct work, even if the derivative work infringes a copyright") (internal quotation marks and citation omitted).

In *Park*, for example, an architect alleged violations of the DMCA against an architectural company arising out of the design, construction, and marketing of the skyscraper at One World Trade Center in New York City.  2019 WL 9228987 at *1.  The architect alleged the architectural company "conveyed" false CMI when the company "identified itself, and not [p]laintiff, as the architect of the building."  *Id*. at *11.  The court dismissed the DMCA claim because the company had "incorporated the plaintiff's copyrighted materials into its own work and then applied its name as the author of the work."  *Id.*  The court explained that while it was possible the plaintiff had sufficiently plead copyright infringement, it had not plead a viable DMCA claim because the defendant had generated a work that was "unquestionably a distinct work" from the architect's work.  *Id.*  Such is the case here.  HBO's Video contains far more content than just the transcription of the telephone call and is unquestionably distinct as a whole from the Video that Pryimachenko posted to YouTube.

Pryimachenko argues *Park* is inapplicable because the side-by-side comparisons of the works in the Amended Complaint show the works are identical, not "unquestionably

distinct." (Pl. Opp. at 22  (quoting *ADR International Ltd. v. Institute for Supply Management. Inc.*, 667 F. Supp.3d 411, 428 (S.D. Tex. 2023)).)  Pryimachenko's argument is not persuasive. In *ADR*, a provider of training courses alleged violations of the DMCA against a competitor for copying and distributing the provider's training materials. 667 F. Supp.3d at 418.  As proof of the alleged violation, the provider attached to the complaint a side-by-side comparison of the presentations. *Id.* The competitor, citing to *Park* and *Crowley*, argued that the comparison showed the presentation materials were not identical copies, and thus the provider did not have a valid DMCA claim. *Id.* at 424, 427-28.

The *ADR* court held that the DMCA was not limited to claims where CMI was distributed in an identical copy of the work. *Id.* at 427-28. The *ADR* court then found *Park* and *Crowley* inapposite because in those cases, the plaintiff had alleged that the works were derivative works, whereas the provider in *ADR* had not. *Id.* The *ADR* court did not believe the presentations were "unquestionably distinct" from each other because the provider alleged facts showing the competitor made superficial changes to the presentation and attached a comparison purporting to show the same. *Id.* at 428. That is not the case here.  The side-by-side comparison of the works as presented by Pryimachenko in the Amended Complaint does not account for either HBO's Video or HBO's promotional materials as a whole.  For example, in the promotional video, the transcription of the call appears on the screen for mere seconds and is weaved between other clips from the television series.  Similarly, HBO's Video includes only a short portion of the transcription and as only a small portion of a full episode.  As in *Michael Greco Productions*, *Park*, and *Crowley*, HBO's Video, as a whole, is unquestionably distinct from

the Video and subject to its own copyright, thereby warranting dismissal of Pryimachenko's § 1202(a) claim.

## B.    Removal of CMI

Pryimachenko also has not alleged a viable claim under §1202(b) of the DMCA. Section 1202(b) prohibits both the intentional removal or alteration of CMI, and the distribution of copyrighted material with knowledge that its CMI has been altered or removed. 17 U.S.C. §§ 1202(b)(2), (3).  To state a claim for intentional removal of CMI under § 1202(b), a plaintiff essentially must allege "(1) the existence of CMI on the [work]; (2) removal and/or alteration of that information; and (3) that the removal and/or alteration was done intentionally."  *BanxCorp v. Costco Wholesale Corp.*, 723 F. Supp.2d 596, 609 (S.D.N.Y. 2010); *see also Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 171 (2d Cir. 2020) (explaining that to state a claim for knowing violation of § 1202(b), a plaintiff must allege: "(1) the existence of CMI in connection with a copyrighted work; and (2) that a defendant 'distribute[d] ... works [or] copies of works'; (3) while 'knowing that [CMI] has been removed or altered without authority of the copyright owner or the law'; and (4) while 'knowing, or ... having reasonable grounds to know' that such distribution 'will induce, enable, facilitate, or conceal an infringement'") (alterations in original) (quoting 17 U.S.C. § 1202(b)).

Pryimachenko alleges that the Video was "routinely published with attribution, credit, and other copyright management information" (AC ¶ 36), that HBO removed that information (*Id.* ¶ 38), and that it did so "knowing or having reason to know that such removal would induce, enable, facilitate, or conceal an[y] infringement" (*Id.* ¶ 42).  To

show that Pryimachenko "included his name and title with the work," the Amended Complaint includes in the following screenshot:



(*Id*. ¶ 36.)  That image is excerpted from the image in Paragraph 10 of the Amended Complaint, which is a screenshot of the YouTube page on which the Video appears:



(*Id*. ¶ 10.)

As can be readily seen, the information Pryimachenko claims as CMI does not appear in the Video itself but instead under the Video on the YouTube website.  CMI does not, however, need "to appear on the work itself"; it only must "be accessible in conjunction with, or appear with, the work being accessed."  *Mango v. BuzzFeed, Inc.*, 356 F. Supp.3d 368, 377-78 (S.D.N.Y. 2019) (internal quotation marks and citation omitted), *aff'd*, 970 F.3d 167 (2d Cir. 2020).  Courts have held that a "gutter credit," or an

identifier "appear[ing] in a separate line of text below the [work] but above the article text," can qualify as CMI, because it is "often placed adjacent to [a work] to indicate its [author]." *Id.* at 372; *see also Wood v. Observer Holdings, LLC*, No. 20-CV-7878, 2021 WL 2874100, at *6 (S.D.N.Y. July 8, 2021) (finding that a "credit line attribution" placed "below each of the 13 photos constitutes CMI"); *Hirsch v. Sell It Social, LLC*, No. 20-CV-153, 2020 WL 5898816, at *3 (S.D.N.Y. Oct. 5, 2020) (reasoning that gutter credit, when "positioned below the Photo," "comes within the definition of CMI because it identified [plaintiff] as the author of the Photo and was 'conveyed in connection with' the Photo's publication") (quoting *Mango*, 356 F. Supp.3d at 376).  Like the photos and articles in the "gutter credit" cases, discernible CMI appears just below the Video, at least as presented on YouTube.

Nonetheless, Pryimachenko cannot maintain a claim based on removal of CMI. While HBO overstates the law as requiring that the two works be "identical" to support a CMI-removal claim (Def. Mem. at 22), Pryimachenko invokes a standard that his own allegations do not and cannot satisfy.  Specifically, Pryimachenko embraces the standard set forth in *Fischer v. Forrest* that a claim for removal of CMI may be found "where a work has been 'substantially or entirely reproduced.'"  (Pl. Opp. at 23 (quoting *Fischer v. Forrest*, 286 F. Supp.3d 590, 609 (S.D.N.Y. 2018), *aff'd*, 968 F.3d 216 (2d Cir. 2020)). The full quote from *Fischer* reads:  "In those cases where claims of removal of CMI have been held viable, the underlying work has been substantially or entirely reproduced."  286 F. Supp.3d at 609.  In contrast, the instant case is not one where, for example, the defendant has appropriated an entire photograph without the accompanying gutter credit,

or, as Pryimachenko forewarns, where the alleged infringer has made only "an immaterial change to a copy and freely affirm[s] that they own it."  (Pl. Opp. at 23.)

Rather, as discussed above in the context of §1202(a), the HBO Video and promotional video, unlike Pryimachenko's Video, contain, as part of a much larger whole, only a brief segment of the telephone call transcription and are unquestionably distinct from the Video that Pryimachenko posted to YouTube.   Pryimachenko's Video is approximately one minute long.  Yet, HBO's Video lasting more than 60 minutes, displays only approximately 33 seconds of the phone call transcription in the context of a much more expansive and longer work.    Similarly, HBO's promotional video lasting approximately 57 seconds, displays only about one second of the telephone transcription. Under these circumstances, there is no plausible claim that the HBO Video or promotional video copy Pryimachenko's Video "substantially or entirely" and thus no claim for removal of CMI.[16]   *See Fischer*, 286 F. Supp.3d at 609 (rejecting CMI-removal claim because accused work – an advertisement – used only four discrete sentences from plaintiff's brochure and website).[17]    Accordingly, regardless of whether Pryimachenko may ultimately have a claim for copyright infringement, his claim for removal of CMI in violation of § 1202(b) should be dismissed.

---

[16] HBO also argues, with respect to both §§ 1202(a) and (b) that the Amended Complaint does not sufficiently allege the requisite scienter, instead only parroting the legal standard.  In light of the other bases for dismissing Pryimachenko's DMCA claims with prejudice, the Court does not further address that issue.

[17] *Cf. Business Casual Holdings, LLC v. TV-Novosti*, No. 21-CV-2007, 2023 WL 1809707, at *2, 7 (S.D.N.Y. Feb. 8, 2023) (on default judgment, finding allegations that defendant incorporated segments of plaintiff's videos into defendant's similar videos, removed plaintiff's watermark embedded in plaintiff's videos, replaced it with defendant's own mark, and took other measures to conceal infringement, sufficiently established violation of §§ 1202(a) and (b)), *R. & R. adopted*, 2023 WL 4267590 (S.D.N.Y. June 28, 2023).

### III. Leave to Amend

Pryimachenko argues that even if the Amended Complaint is deficient with respect to exemption from registration in the United States, dismissal of his infringement claim should be without prejudice and with leave to amend because Pryimachenko could "register his work and amend, preventing the need to refile post-registration."  (Pl. Opp. at 24.)  The Court agrees that dismissal should be without prejudice and with leave to amend, but not for the reason advanced by Pryimachenko.

If a plaintiff claims infringement of a work that requires registration, but has not been registered, "no amendment can cure the deficiency in [p]laintiff's complaint" and "leave to amend should not be granted" "[b]ecause copyright registration is a statutory prerequisite to the filing of an infringement action."  *Greene v. Pete*, No. 22-CV-4220, 2023 WL 2393873, at *4 (S.D.N.Y. Jan. 3, 2023), *R. & R. adopted*, 2023 WL 2043951 (S.D.N.Y. Feb. 16, 2023).  Allowing otherwise would "would fly in the face of Section 411(a)'s text, which provides that registration must be complete before a civil action is instituted, and would defeat Congress's purpose to maintain[ ] registration as prerequisite to suit, not just to liability."  *Malibu Media, LLC v. Doe*, No. 18-CV-10956, 2019 WL 1454317, at *3 (S.D.N.Y. Apr. 2, 2019) (internal quotation marks and citations omitted).

Here, Pryimachenko may be able to sufficiently plead that the Video is exempt from U.S. registration.  If so, registration in the U.S. would not be a prerequisite to suit. Accordingly, granting him leave to amend is appropriate.  *See UAB*, 2019 WL 6219223, at *7 (granting plaintiff leave to amend after dismissing copyright infringement claim for failure to sufficiently plead the place of first publication).  Alternatively, Pryimachenko could obviate the issue by registering the Video with the U.S. Copyright Office and then

filing a new action.  Thus, even if leave were not granted to amend, he would be entitled to dismissal without prejudice.  *See Greene*, 2023 WL 2393873, at *4 ("Because the deficiency is due to the timing of registration, itself akin to an administrative exhaustion requirement, dismissal should be without prejudice").

As for the DCMA claims, leave to amend should not be granted.  No amendment can cure what is plain from the works at issue; i.e., the HBO Video incorporates a non-substantial portion of the transcribed call into a larger, more complex, distinct work created by HBO and cannot support a claim for providing false CMI under 17 U.S.C. § 1202(a) or removing CMI under 17 U.S.C. § 1202(b).

## CONCLUSION

For the foregoing reasons, I recommend that HBO's motion be GRANTED and the Complaint be dismissed.  Dismissal of the infringement claim should be with leave to amend and without prejudice to refiling in the event Plaintiff registers his work with the U.S. Copyright Office.  The DCMA claims should be dismissed with prejudice.

## PROCEDURES FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation.  Any party shall have fourteen (14) days to file a written response to the other party's objections.  Any such objections and responses shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Lewis A. Kaplan, United States Courthouse, 500 Pearl Street, New York, New York 10007, and to the Chambers of the undersigned, at United States Courthouse, 500 Pearl Street, New York, New York 10007.  Any request for an extension of time for filing

objections must be addressed to Judge Kaplan.  **Failure to file timely objections will result in a waiver of the right to object and will preclude appellate review.**

Respectfully submitted,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: January 14, 2025
       New York, New York

Copies transmitted this date to all counsel of record.